# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 17, 2009          Decided May 26, 2009

No. 08-1016

NATIONAL CABLE & TELECOMMUNICATIONS ASSOCIATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

AT&T INC., ET AL.,
INTERVENORS

---

Consolidated with 08-1017

---

On Petitions for Review of an Order
of the Federal Communications Commission

---

*Paul M. Smith* argued the cause for petitioner National Cable & Telecommunications Association. With him on the briefs were *Daniel L. Brenner*, *Neal M. Goldberg*, and *Michael S. Schooler*.

*Matthew C. Ames* argued the cause for petitioners National Multi Housing Council and National Apartment Association and intervenor Manufactured Housing Institute. With him on the briefs was *John McDermott*.

*Joel Marcus*, Counsel, Federal Communications Commission, argued the cause for respondent. On the brief were *Matthew B. Berry*, General Counsel, *Joseph R. Palmore*, Deputy General Counsel, *Daniel M. Armstrong*, Associate General Counsel, and *Laurence N. Bourne*, Counsel. *Nancy C. Garrison*, *Catherine G. O'Sullivan*, and *Kristen C. Limarzi*, Attorneys, U.S. Department of Justice, entered appearances.

*Andrew G. McBride* argued the cause for intervenors AT&T Inc., et al. With him on the brief were *Joshua S. Turner*, *David C. Rybicki*, *Gary Phillips*, *Christopher M. Heimann*, *Michael E. Glover*, *Edward Shakin*, *William H. Johnson*, and *Harry F. Cole*.

Before: TATEL and GARLAND, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Concurring opinion by *Senior Circuit Judge* SILBERMAN.

TATEL, *Circuit Judge*: Finding that exclusivity agreements between cable companies and owners of apartment buildings and other multi-unit developments have an anti-competitive effect on the cable market, the Federal Communications Commission banned such contracts. The Commission believes that these deals—which involve a cable company exchanging a valuable service like wiring a building for the exclusive right to provide service to the residents—may be regulated under section 628 of the Communications Act as cable company practices that significantly impair the ability of their competitors to deliver programming to consumers. The Commission thus forbade cable operators not only from entering into new exclusivity contracts, but also from enforcing old ones. Petitioners, associations representing cable operators and apartment building owners,

argue that the Commission exceeded its statutory authority, arbitrarily departed from precedent, and otherwise violated the Administrative Procedure Act. Having carefully considered the parties' excellent submissions, we disagree and conclude that the Commission acted well within the bounds of both section 628 and general administrative law.

**I.**

Understanding this controversy requires that we begin by explaining a few unintuitive statutory terms. The provision at issue here, section 628(b) of the Communications Act, makes it unlawful "for a cable operator . . . to engage in unfair methods of competition or unfair or deceptive acts or practices, the purpose or effect of which is to hinder significantly or to prevent any multichannel video programming distributor from providing satellite cable programming or satellite broadcast programming to subscribers or consumers." 47 U.S.C. § 548(b). "Cable operators" are just companies that deliver video programming by cable, like Comcast and Time-Warner. *See* 47 U.S.C. § 522(5)–(7). "Multichannel video programming distributors" (MVPDs) are a broader set of companies that provide video programming to subscribers. MVPDs include not only cable operators like Comcast but also direct broadcast satellite companies like DirecTV. *See* § 522(13). Although "satellite cable programming" and "satellite broadcast programming" differ somewhat—they originate from slightly different kinds of entities, *compare* § 548(i)(1), *and* 47 U.S.C. § 605(d)(1), *with* § 548(i)(3)—both terms essentially refer to programming (i.e., television shows) transmitted to MVPDs via satellite for retransmission to subscribers. For our purposes, the important point about them is this: petitioners nowhere dispute the Commission's finding that "most programming is delivered via satellite" and so falls within one of these two categories. *Exclusive Service Contracts for Provision of Video Services in*

*Multiple Dwelling Units and Other Real Estate Developments* ("*Order*"), 22 F.C.C.R. 20,235, 20,255, ¶ 43 n.132 (2007). Section 628(b)'s plain terms thus prohibit cable company practices with the purpose or effect of preventing competing MVPDs, including other cable companies, from providing the two predominant types of programming to consumers.

The Commission first considered exclusivity contracts between cable operators and so-called multiple dwelling units (MDUs) as an ancillary part of its "2003 *Inside Wiring Order*." *See In re Telecommunications Services Inside Wiring*, 18 F.C.C.R. 1342, 1366–70, ¶¶ 63–71 (2003). That proceeding primarily concerned the ownership status of certain wiring inside MDUs, and the Commission's order considered some thirteen different issues presented by its new wiring rules. But the Commission also addressed a related issue raised in a separate notice of proposed rulemaking, namely "whether it would be appropriate to cap exclusive contracts to open up MDUs to potential competition on a building-wide or unit-to-unit basis, and, if so, what would represent a reasonable cap." *Id.* at 1366, ¶ 63. Reviewing the evidence then available, the Commission found that there was no "sufficient basis in this record to ban or cap the term of exclusive contracts." *Id.* at 1369, ¶ 68; *see also id.* at 1369–70, ¶¶ 69–71.

Four years later, the Commission returned to exclusivity contracts in a rulemaking devoted solely to that question. *See Order*, 22 F.C.C.R. at 20,235–64, ¶¶ 1–60. Analyzing the competitive harms and benefits of exclusivity clauses, *see id.* at 20,241–51, ¶¶ 11–29, the Commission this time concluded that "exclusivity clauses cause significant harm to competition and consumers that the record did not reflect at the time of our 2003 Inside Wiring Order," *id.* at 20,248–49, ¶ 26; *see also id.* at 20,249–51, ¶¶ 27–29. And because the

Commission found that the record now supports regulation, this time it extensively analyzed its authority to ban such contracts, concluding that both section 628 and its "ancillary authority" empower it to act. *Id.* at 20,254–64, ¶¶ 40–60. The Commission accordingly prohibited cable companies from "enforcing existing exclusivity clauses and executing contracts containing new ones," *id.* at 20,251, ¶ 30, rejecting more limited remedial options, *id.* at 20,251–54, ¶¶ 33–39.

Petitioners, a cable industry group called the National Cable & Telecommunications Association (NCTA) and a pair of affiliated real estate groups ("real estate petitioners"), find various faults with this regulatory turnabout. They believe that the Commission failed to justify its change in policy and to consider the retroactive effects of its action. They also believe that the Commission ventured into real-estate affairs over which it has no jurisdiction and should have enacted a more limited remedy. But most fundamentally, they believe that the Commission exceeded its section 628 authority in regulating exclusivity deals at all. It is to this question of statutory construction that we first turn.

## II.

Because this issue involves an agency's interpretation of its governing statute, *Chevron*'s familiar framework applies. *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842–43 (1984). First, we ask if the statute unambiguously forecloses the agency's interpretation. *E.g.*, *Hazardous Waste Treatment Council v. EPA*, 886 F.2d 355, 361 (D.C. Cir. 1989). If so, we disregard the agency's view and "give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 843. If the statute is ambiguous enough to permit the agency's reading, however, we defer to that interpretation so long as it is reasonable. *E.g.*, *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 299 (D.C. Cir. 2003).

Conceding that on a literal reading of the statute exclusivity contracts do have the "effect" of preventing competing MVPDs from "providing satellite cable programming or satellite broadcast programming to subscribers or consumers," § 548(b); *see* Oral Arg. 3:03–3:34, petitioners nonetheless argue that section 628's text, structure, and history demonstrate that it was addressed to a different evil altogether. *Cf. Pharm. Research & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001) (using all "traditional tools of statutory interpretation," including "text, structure, purpose, and legislative history," to ascertain Congress's intent at *Chevron* step one). Congress, they argue, was concerned not with barriers to *service* but with practices that prevent cable competitors from obtaining certain kinds of *programming* that the American public wants to watch. Textually, they emphasize Congress's identification of "satellite cable programming" and "satellite broadcast programming" in particular, arguing that the Commission has read these well-defined terms out of the statute. Structurally, they emphasize section 628(c), which directs the Commission to implement subsection (b) with rules and procedures focused on fair dealing between programming vendors and MVPDs, not on anti-competitive barriers to service generally. And for legislative history they cite the bill's sponsor, who intended his legislation to "require[] the cable monopoly to stop refusing to deal, to stop refusing to sell its products to other distributors of television programs," 138 Cong. Rec. H6487, H6533 (Rep. Tauzin), thus addressing his concern that "the hot shows are controlled by cable," *id.* at H6534; *see also id.* at H6533 ("[T]his bill says to the cable industry, 'You have to stop what you have been doing, and that is killing off your competition *by denying it products*.'" (emphasis added)). Petitioners thus argue that in enacting section 628(b), Congress intended to prevent the cable industry from starving its competition of programming—nothing more, nothing less.

For its part, the Commission concedes that Congress's primary purpose in enacting section 628 was indeed to expand competition for programming, not service. But this primary purpose is hardly dispositive, it argues, because "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). Reviewing the same text, structure, and legislative history, the Commission interprets section 628 to permit regulation of exclusive service agreements as an evil that easily falls within the literal terms of the statute and is reasonably comparable to the paradigmatic anti-competitive practices that section 628 specifically targets. *See Order*, 22 F.C.C.R. at 20,254–64, ¶¶ 40–60. We agree.

Beginning, "as always, with the plain language of the statute," *Citizens Coal Council v. Norton*, 330 F.3d 478, 482 (D.C. Cir. 2003), we find nothing in section 628 that unambiguously forecloses the Commission's interpretation. What the Commission forbade lies within the literal terms of section 628(b)'s proscription. Indeed, exclusivity agreements have both the proscribed "purpose" and the proscribed "effect"—cable operators execute them precisely so that they can be the sole company serving a building, and as petitioners themselves put it, "if you can't serve a building then you can't deliver satellite cable programming and satellite broadcast programming," Oral Arg. 3:29–3:34.

To be sure, if Congress specifically intended to forbid practices having an anti-competitive effect on service generally, focusing only on two particular kinds of programming would have been an odd way to accomplish that result. But the existing language would have been an equally

odd way of proscribing only unfair dealing between programming vendors and MVPDs (as petitioners submit) because the words Congress chose focus not on practices that prevent MVPDs from *obtaining* satellite cable or satellite broadcast programming, but on practices that prevent them from "providing" that programming "to subscribers or consumers." § 548(b). Mindful that "statutes written in broad, sweeping language should be given broad, sweeping application," *Consumer Elecs.*, 347 F.3d at 298, we note section 628(b)'s broad and sweeping terms, which prohibit practices "the purpose *or effect* of which is to *hinder significantly* or to prevent *any* multichannel video programming distributor from providing satellite cable programming or satellite broadcast programming to subscribers or consumers." § 548(b) (emphasis added). This breadth comports with section 628's express purpose of "promot[ing] the public interest, convenience, and necessity by increasing competition and diversity in the multichannel video programming market," 47 U.S.C. § 548(a). Thus, while the specificity of section 628's references to satellite cable and satellite broadcast programming may reveal the primary evil that Congress had in mind, nothing in the statute unambiguously limits the Commission to regulating anti-competitive practices in the delivery of those kinds of programming by methods addressed to that narrow concern alone. *See Oncale*, 523 U.S. at 79.

For their structural argument, petitioners emphasize that subsections (c) through (f) of section 628 require regulations, remedies, and procedures uniquely suited to the problem of unfair dealing over television shows between programming vendors controlled by cable and competing MVPDs. *See* § 548(c)–(f). Section 628(c)(2)(C), which requires the Commission to "prohibit practices . . . including exclusive contracts . . . that prevent a multichannel video programming

distributor from obtaining such programming," well represents this point, *see* § 548(c)(2)(C), as does section 628(e)(1), which specifically authorizes the Commission to remedy violations by setting "prices, terms, and conditions of sale of programming," § 548(e)(1). From this, petitioners infer that the Commission's focus on competition for service rather than programming fits uncomfortably with Congress's focus on programming, not service.

But this structural argument is a double-edged sword, and its second—perhaps, leading—edge cuts sharply against petitioners. By its terms, section 628(c) describes only the "[m]inimum contents of regulations," § 548(c)(2), and as the Commission itself noted, Congress's enumeration of specific, required regulations in subsection (c) actually suggests that Congress intended subsection (b)'s generic language to cover a broader field, *see Order*, 22 F.C.C.R. at 20,256, ¶ 44. The Commission's remedial powers similarly extend beyond the kinds of unfair-dealing interventions Congress specifically foresaw. Indeed, instead of limiting the Commission to those powers, Congress broadly authorized the Commission to "prescribe regulations to specify particular conduct that is prohibited by subsection (b)," § 548(c)(1), to "prescribe regulations to implement this section," § 548(f), and to "order appropriate remedies" including but expressly not limited to the price-setting option, § 548(e)(1)–(2). Ultimately, then, our view of section 628's structure mirrors our view of its text: Congress had a particular manifestation of a problem in mind, but in no way expressed an unambiguous intent to limit the Commission's power solely to that version of the problem.

Petitioners' legislative history argument suffers from the same deficiency. Although they point to considerable evidence that Congress was specifically concerned with unfair dealing over programming, they offer no evidence from the

legislative record to show that Congress chose its language so as to limit the Commission solely to that particular abuse of market power.  True, Representative Tauzin introduced this legislation to "say[] to the cable industry, 'You have to stop . . . killing off your competition by denying it products,'" 138 Cong. Rec. H6487, H6533 (Rep. Tauzin), but the principal concern of one congressman helps little in locating the limits of the language chosen by all members of both houses.  *See Oncale*, 523 U.S. at 79 ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").  Nor is the legislative history one-sided: the House of Representatives preferred section 628(b)'s broad language to another contemporaneous suggestion expressly limited to unreasonable refusals to deal.  *See* H.R. 1303, 102d Cong. § 8 (1992).  Thus, even if legislative history could carry petitioners all the way from statutory language that literally authorizes the Commission's action to the proposition that the statute unambiguously forecloses the agency's view, *this* legislative history cannot.

Petitioners counter with an insightful hypothetical. Suppose the statute replaced the terms "satellite cable programming or satellite broadcast programming" with "Spanish-language programming."  Could the Commission still forbid exclusivity contracts by reasoning that "if competitors can't serve a building, they can't provide Telemundo"?  If so, petitioners have raised the specter of a statutory grant without bounds, for one would be hard pressed to imagine any cable industry practice not having at least a marginal effect on competitors' ability to provide particular kinds of programming.

We think this apparent overbreadth argument is best analyzed at *Chevron* step two—as claiming, in effect, that although the statute does not unambiguously limit the kinds of practices that the Commission may regulate as having the proscribed "effect," the Commission might still act unreasonably by extrapolating from a narrow effect (i.e., an effect on Spanish TV) to any practice causing it, however removed (i.e., TV service generally). That argument has merit as far as it goes: in proscribing an overbroad set of practices with the statutorily identified effect, an agency might stray so far from the paradigm case as to render its interpretation unreasonable, arbitrary, or capricious. *See, e.g.*, *AFL-CIO v. Chao*, 409 F.3d 377, 384 (D.C. Cir. 2005) ("[W]hatever ambiguity may exist cannot render nugatory restrictions that Congress has imposed."). That said, the argument just doesn't go very far in this case. Petitioners' hypothetical derives whatever force it has from the fact that Spanish-language programming would rightly be understood as a niche—a fact that would lend special force to the view that the Commission, in regulating all service as affecting Spanish programming, was taking unreasonably overbroad action to achieve an objective Congress never intended to authorize. But satellite programming is hardly a niche. Indeed, petitioners nowhere dispute that it encompasses "most programming," *Order*, 22 F.C.C.R. at 20,255, ¶ 43 n.132. Thus, in regulating exclusivity deals as having the purpose or effect of hindering delivery of these kinds of programming, the Commission barely reached beyond the paradigm case at all. In this regard, we think it noteworthy that among the many narrower remedies commenters suggested, not one urged the Commission to modify its rule so as to ban exclusivity deals only to the extent they affect satellite cable or satellite broadcast programming alone.

12

In the end, petitioners are unable to satisfy their heavy burden. To prevail at *Chevron* step one, they must show that section 628(b) is unambiguously limited to Congress's principal concern with unfair program hoarding. Because Section 628's actual words reach the behavior the Commission prohibited, petitioners are left to argue "that the Commission relies almost entirely on a literal reading of the statutory language—not the most damning criticism when it comes to statutory interpretation." *Consumer Elecs.*, 347 F.3d at 297 (internal quotation marks and citation omitted). And while the statute's text, structure, and history do support the proposition that Congress was, in fact, principally concerned with program hoarding, none suggests that Congress chose its language to limit the Commission to regulating that evil alone. Indeed, having employed all available tools of statutory construction, we find little that suggests any congressional intent to limit section 628(b) to competition for programming, and so are unable to conclude that a reading literally permitted is nonetheless unambiguously foreclosed. At the very best, petitioners have demonstrated some ambiguity as to whether Congress intended to allow regulation of exclusivity contracts along with unfair dealing over programming—ambiguity the Commission reasonably resolved in favor of its own interpretation. Thus, concluding that section 628(b) authorizes the Commission's action, we needn't consider the Commission's ancillary authority.

Real estate petitioners' separate attack on the Commission's authority has little merit. They argue that the exclusivity ban impermissibly regulates the real estate industry, which lies outside the Commission's jurisdiction. The terms of the challenged prohibition apply only to cable companies, however, and they neither require nor prohibit any action by MDUs. *See Order*, 22 F.C.C.R. at 20,253, ¶ 37 ("We merely prohibit the enforcement of existing exclusivity

clauses and the execution of new ones *by cable operators*." (emphasis added)). As we have emphasized, "no canon of administrative law requires us to view the regulatory scope of agency actions in terms of their practical or even foreseeable effects." *Cable & Wireless, P.L.C. v. FCC*, 166 F.3d 1224, 1230 (D.C. Cir. 1999). The alternative is untenable, as most every agency action has relatively immediate effects for parties beyond those directly subject to regulation. For just one example, no one questions the Commission's jurisdiction to promulgate the 2003 *Inside Wiring Order* even though it dealt with myriad issues affecting the MDU industry, including such critical minutiae as whether wiring behind sheet rock is "physically inaccessible" and so must be opened to competing providers. 18 F.C.C.R. at 1362–62, ¶¶ 48–53; *see also Nat'l Cable & Telecomm. Ass'n v. FCC*, No. 07-1356, 2008 WL 4808911, at *1 (D.C. Cir. Oct. 23, 2008). "Approximately 30 percent of Americans live in MDUs, and their numbers are growing." *Order*, 22 F.C.C.R. at 20,235, ¶ 1. We decline to put issues relating to their cable service outside the Commission's authority simply because those issues also matter to their landlords.

## III.

For their primary APA claim, petitioners argue that in deciding "to bar [exclusivity contracts] now, after affirmatively permitting them in 2003," the Commission failed to explain its change of heart and thus acted arbitrarily and capriciously. NCTA Opening Br. 28. Of course, "it is axiomatic that agency action must either be consistent with prior action or offer a reasoned basis for its departure from precedent." *Williams Gas Processing Gulf Coast Co. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006) (internal quotation marks and brackets omitted). Yet it is equally axiomatic that an agency is free to change its mind so long as it supplies "a reasoned analysis," *Motor Vehicle Mfrs. Ass'n of the United*

*States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) (internal quotation marks omitted), showing that "prior policies and standards are being deliberately changed, not casually ignored," *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970) (Leventhal, J.); *see also FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1811 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position."). Petitioners believe that the Commission has neither reasonably disavowed the logic of the 2003 *Inside Wiring Order* nor explained how that logic could fail to produce the same outcome on the record now presented. Finding the Commission's extensive discussion of its change in approach more than equal to our forgiving standard of review, we disagree.

Petitioners' argument begins with a substantial over-reading of the 2003 *Inside Wiring Order*. Taking a few preferred sentences out of context, they argue that the Commission committed itself to an express logic: where cable already faces increasingly effective competition, it is inappropriate to interfere with exclusivity contracts. And since competition continued to increase between 2003 and 2007, petitioners argue, the Commission's own logic bars it from acting differently now.

To be sure, as petitioners emphasize, the 2003 *Inside Wiring Order* does conclude with the following two sentences: "We note that competition in the MDU market is improving, even with the existence of exclusive contracts. Accordingly, we decline to intervene." 18 F.C.C.R. at 1370, ¶ 71. But context matters, and here it makes clear that petitioners have confused a mere contributing factor with a sufficient condition. The uncited portions of that same

paragraph note that commenters "identified both pro-competitive and anti-competitive aspects of exclusive contracts," and that the Commission was unable to "state, *based on the record*, that exclusive contracts [were] predominantly anti-competitive." *Id.* (emphasis added). Indeed, reading the four short paragraphs the Commission devoted to the issue in their entirety, we think it quite clear that the Commission based its unwillingness to intervene in 2003 primarily on the absence of a sufficient record. *See id.* at 1369, ¶ 68 ("[W]e do not find a sufficient basis in this record to ban or cap the term of exclusive contracts."); *id.* at 1369, ¶ 69 ("The record does not indicate the extent to which exclusive contracts have been utilized . . . ."); *id.* at 1369, ¶ 70 ("[T]he current record is insufficient to justify government-sanctioned caps of any length . . . ."); *id.* at 1370, ¶ 71 ("[T]he record does not support a prohibition on exclusive contracts . . . ."). In short, the Commission acknowledged in its 2003 *Inside Wiring Order* that exclusivity contracts could either foster competition over entire buildings or foil competition over individual units, and that decision indicates only that the record then available was insufficient to resolve this question. Contrary to petitioners' claim, nothing about this logic commits the Commission to abstaining from regulation whenever competition is increasing—one could easily imagine that, however much competition improved despite exclusivity agreements, it would have improved more without them.

Conversely, petitioners give the Commission far too little credit for its extensive analysis of this issue in the order before us today. Rather than merely observing, as it did in 2003, that exclusivity agreements could theoretically have both pro-competitive and anti-competitive effects, in 2007 the Commission extensively analyzed the question, *see Order*, 22 F.C.C.R. at 20,243–51, ¶¶ 16–29, and concluded that "the

harms significantly outweigh the benefits in ways they did not at the time of the Commission's 2003 *Inside Wiring Order*." *Id.* at 20,243, ¶ 16. The Commission found that exclusivity agreements would likely raise prices, limit access to certain programming, and delay deployment of fiber optic and broadband technologies. *Id.* at 20,244–46, ¶¶ 17–20. It placed particular emphasis on so-called "triple play"—where phone or cable companies use modern wiring to provide video, telephone, and internet service as a bundled package. Such packages are uniquely relevant, as they represent a highly effective form of competition between large, pre-existing companies that has expanded since the 2003 *Inside Wiring Order*. *Id.* at 20,245–46, ¶¶ 19–21. The Commission found that triple play competition between phone and cable providers lowers prices, spurs deployment of advanced technology, and facilitates efficiency and simplicity in the market. *Id.* If the incumbent has exclusive rights to video service, however, then competitors will be unable to offer a bundle, thus inhibiting new entry and denying consumers the competitive and efficiency benefits of triple play. *Id.* at 20,246, ¶ 21. "These harms to consumers are greater than they were several years ago," the Commission found, because in 2003 "new entry by [phone companies] had not yet begun on a large scale, the recent increase in fiber construction had not yet materialized, and the popularity of triple play was unproven." *Id.* at 20,245, ¶ 19.

Moreover, the Commission fully considered contrary comments. Specifically, it acknowledged the view that exclusivity contracts might spur investment by allowing cable operators some certainty that they could recoup their sunk costs, or might enable MDU residents to pool their bargaining power and thus extract cable company concessions. *Id.* at 20,247–48, ¶¶ 24–25. In the end, however, the Commission meticulously rejected these arguments as unpersuasive,

finding that the interests of MDU owners would not always align with those of the residents, that agreements may have been signed before competition even existed, and that, for many other reasons, the record failed to substantiate the practical reality of these theoretical benefits. *See id.* at 20,246–47, ¶ 22, 20,249–51, ¶¶ 28–29. Contrary to petitioners' argument, this balancing of harms and benefits did not repudiate the logic of the 2003 *Inside Wiring Order*. Instead, it merely resolved the very question on which the Commission found the earlier record insufficient.

Indeed, even were the analysis in the 2003 *Inside Wiring Order* more extensive, and even had it expressly committed the Commission to petitioners' preferred logic, the 2007 *Order*'s analysis would still easily satisfy our deferential standard of review. As the Supreme Court recently put it, "[the Commission] need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better." *Fox Television*, 129 S. Ct. at 1811. In other words, the existence of contrary agency precedent gives us no more power than usual to question the Commission's substantive determinations. We still ask only whether the Commission has adequately explained the reasons for its current action and whether those reasons themselves reflect a "'clear error of judgment.'" *DirecTV, Inc. v. FCC*, 110 F.3d 816, 826 (D.C. Cir. 1997) (quoting *State Farm*, 463 U.S. at 43). Here, the Commission could hardly have made its "good reasons" for its current policy clearer: it believes that individual consumers are more likely to capture the benefits of competition in the absence of exclusivity agreements. It reasoned that

although "competition for the MDU" may have some theoretical advantages in some cases over competition for individual consumers, it may not describe reality in many cases. Even if it does, in general we find that the best results for consumers come from preserving their ability to play an active role in making an individual choice rather than allowing cable operators using exclusivity clauses to foreclose individual choice. In addition, as noted above, exclusivity contracts tend to insulate the incumbent from any need to improve its service. Thus, we conclude that exclusivity clauses generally do not benefit MDU residents.

*Order*, 22 F.C.C.R. at 20,250, ¶ 28. Given this explanation, together with the rest of the Commission's extensive analysis of exclusivity contracts, we can easily see a clear articulation of the concerns driving its change in policy, as well as the basis for the new, reasonable inferences the Commission drew from a significantly updated record. This marks the limits of our review.

Petitioners also dispute certain findings relevant to the Commission's decision, including the increased importance of triple play and the fact that incumbents are responding to this increased competition by using exclusivity agreements to "lock-up" large clients like MDUs. *Id.* at 20,240–41, ¶ 10. These findings rest on substantial record evidence, however, *see, e.g.*, *id.* at 20,240–41, ¶ 10 & nn.23–34, 20,243, ¶ 14 (discussing various commenters identifying exclusivity deals as locking out competitive providers), and the Commission reasonably explained that the lack of even more evidence of exclusivity clauses was attributable to the fact that "many

MDU owners are unwilling or legally unable to make public the contracts containing them," *id.* at 20,242, ¶ 12. Thus, the Commission used the evidence before it to make a reasonable prediction about the likely present and future effects of changing competitive pressures on the cable market. In that setting, "[s]ubstantial evidence does not require a complete factual record—we must give appropriate deference to predictive judgments that necessarily involve the expertise and experience of the agency." *Time Warner Entm't Co. v. FCC*, 240 F.3d 1126, 1133 (D.C. Cir. 2001).

Mounting a separate complaint, real estate petitioners argue that the Commission acted arbitrarily by rejecting their proposed alternative remedies, including case-by-case adjudication. This argument runs aground on bedrock administrative law, which puts "the choice . . . between proceeding by general rule or by individual, ad hoc litigation . . . primarily in the informed discretion of the administrative agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947). The case-by-case approach the MDU owners prefer makes sense in the context of the fact-specific, price-setting remedy contemplated by sections 628(d) and (e) for violations such as unfair refusals to deal. In the context of a general problem like exclusivity agreements, however, we see considerable wisdom in the Commission's determination to "avoid the burden that would be imposed by numerous individual adjudications," *Order*, 22 F.C.C.R. at 20,254, ¶ 38— a judgment petitioners have given us no reason to doubt.

## IV.

The final issue presented concerns the Commission's decision to apply its rule to existing contracts. According to petitioners, this amounts to "directly retroactive" action barred by the APA's requirement that "legislative rules . . . be given future effect only," *Chadmoore Comm'ns, Inc. v. FCC*,

113 F.3d 235, 240 (D.C. Cir. 1997) (internal quotation marks omitted), or, alternatively, to agency action with harmful, secondarily retroactive effects that the Commission failed to consider, *see, e.g.*, *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 745 (D.C. Cir. 1986) ("[R]etroactive modification or rescission of [a] regulation can cause great mischief.  An agency must balance this mischief against the salutary effects, if any, of retroactivity.").  Neither argument persuades.

First, we think it readily apparent that the Commission's action has only "future effect" as the APA and our precedents use that term.  The exclusivity ban purports to alter only the present situation, not "the past legal consequences of past actions."  *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 219 (1988) (Scalia, J., concurring)).  Petitioners insist that under our precedent, "[t]he critical question" is only whether the Commission's rule "changes the legal landscape." *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 859 (D.C. Cir. 2002) (internal quotation marks omitted).  Of course, if that were all it took to render a rule impermissible under the APA, it would spell the end of informal rulemaking. We have thus repeatedly made clear that an agency order that only "upsets expectations based on prior law is not retroactive," *Mobile Relay Assocs.*, 457 F.3d at 11 (internal quotation marks omitted).  That describes precisely this case. Here the Commission has impaired the future value of past bargains but has not rendered past actions illegal or otherwise sanctionable.  "It is often the case that a business will undertake a certain course of conduct based on the current law, and will then find its expectations frustrated when the law changes." *Chem. Waste Mgmt. v. EPA*, 869 F.2d 1526, 1536 (D.C. Cir. 1989).  Such expectations, however

legitimate, cannot furnish a sufficient basis for identifying impermissibly retroactive rules.

Petitioners' alternative argument regarding secondary retroactivity fares somewhat better, but not well enough. Our case law does require that agencies balance the harmful "secondary retroactivity" of upsetting prior expectations or existing investments against the benefits of applying their rules to those preexisting interests. *See, e.g.*, *Bergerco Canada v. U.S. Treasury Dep't*, 129 F.3d 189, 192–93 (D.C. Cir. 1997). And by significantly altering the bargained-for benefits of now-unenforceable exclusivity agreements, the Commission has undoubtedly created the kinds of secondary retroactive effects that require agency attention and balancing. Petitioners' argument nonetheless fails for an obvious reason: the Commission did expressly consider the relative benefits and burdens of applying its rule to existing contracts and, after extensive analysis, concluded that banning enforcement of existing contracts was essential. *Order*, 22 F.C.C.R. at 20,252–53, ¶ 35–37. The Commission found it "strongly in the public interest" to prevent the harms from existing contracts "to continue for years," or to "continue indefinitely in the cases of exclusivity clauses that last perpetually." *Id.* at 20,252, ¶ 35. Legitimate expectations, it noted, were left largely undisturbed, because "[t]he lawfulness of exclusivity clauses ha[d] been under [the Commission's] active scrutiny for a decade," and both the Commission and several individual states had already taken similar actions. *Id.* at 20,252–53, ¶ 36. Finally, the Commission explained that incumbent operators would continue to reap the benefits of their natural monopolies, as they "will still be able to use their equipment in MDUs to provide service to residents who wish to continue to subscribe to their services." *Id.* at 20,253, ¶ 37.

Once again, we think this extensive discussion easily satisfies the Commission's obligation under our deferential standard of review. The Commission balanced benefits against harms and expressly determined that applying the rule to existing contracts was worth its costs. Indeed, it devoted as much analysis to this narrow issue as it did to the entire question of exclusivity contracts in the 2003 *Inside Wiring Order* on which petitioners claim they reasonably relied. Thus, although petitioners believe that the 2003 order promised them that their exclusivity deals would remain valid, we agree with the Commission that any cautious administrative lawyer would have understood that the Commission could later take precisely the action it decided against in 2003. That agencies may change their minds is, after all, a matter of hornbook law—all the more so where, as here, the initial decision not to act was based on the insufficiency of the record. We thus see nothing unreasonable in the Commission's balancing of the benefits and costs and, following familiar principles of judicial review, we decline to rebalance those factors for ourselves.

## V.

In sum, we see the challenged order as fully authorized by section 628 and the product of careful agency reconsideration. The petitions for review are denied.

*So ordered.*

SILBERMAN, *Senior Circuit Judge*, *concurring*: I fully agree with the court's opinion. Petitioners, without citing the case, are relying, in part, on the holding of the Supreme Court in *Holy Trinity Church v. United States*, 143 U.S. 457 (1892). In that case, the Court was faced with a statute that unequivocally made it a crime to assist or encourage *an*y alien to move to the United States to perform "labor or service of *any* kind." *Id*. at 458 (emphasis added). The Church had brought a minister from England to lead a New York congregation. The Court looked to legislative history to conclude that Congress was concerned with the importation of cheap, unskilled labor–not the likes of a clergyman (although, just as in our case, nothing in the legislative history indicated a limit on the broad statutory language). The Court fatefully said, "a thing may be within the letter of the statute and yet not within the statute because not within its spirit, nor within the intention of its makers." The seminal article criticizing that approach is John Manning, *Textualism and the Equity of the Statute*, 101 Columbia L. Rev. 1, 14 (2001).

*Holy Trinity Church* has been used by the Supreme Court ever since–at least up to recent times–to justify statutory interpretation which, in truth, accorded with a judicial view of wise policy. *See*, *e.g.*, *NLRB v. Fruit and Vegetable Packers and Warehousemen Local 766*, 377 U.S. 58, 72 (1964). However, even justices who might have otherwise been sympathetic to the *Holy Trinity* "methodology" would not have been inclined to favor petitioners' policy position.