# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 17, 2010      Decided December 21, 2010

No. 10-1070

NATIONAL PETROCHEMICAL & REFINERS ASSOCIATION,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

GROWTH ENERGY AND NATIONAL BIODIESEL BOARD,
INTERVENORS

---

Consolidated with No. 10-1071

---

On Petitions for Review of a Final Action
of the Environmental Protection Agency

---

*Robert A. Long Jr.* argued the cause for petitioners. With him on the briefs were *Keith A. Noreika*, *Mark W. Mosier*, *James McCall Smith*, *Chet Thompson*, and *Daniel Wolff*.

*Daniel R. Dertke*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief was *Robert G. Dreher*, Acting Assistant Attorney General.

*Dan Himmelfarb* argued the cause for intervenors. On the brief were *Jerome C. Muys, Jr.*, *Laura Ford Brust*, *Stuart A.C. Drake*, *Jeffrey Bossert Clark*, *John C. O'Quinn*, and *William H. Burgess*.

Before: GINSBURG, ROGERS and GARLAND, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: In 2007, Congress enacted the Energy Independence and Security Act ("the EISA"), Pub. L. No. 110–140, §§ 201–204, 121 Stat. 1492 (codified as amended at 42 U.S.C. § 7545(o) (Supp. II 2008)). It expanded the renewable fuel program under the Energy Policy Act of 2005, Pub. L. No. 109–58, § 1501, 119 Stat. 594 (codified as amended at 42 U.S.C. § 7545(o) (Supp. 2006)) ("2005 Act"), which required that set volumes of renewable fuel be incorporated into gasoline sold in the United States each year. The EISA increased the volume requirements for renewable fuel and added new volume requirements for advanced biofuels, biomass-based diesel, and cellulosic biofuel. Congress thus sought "[t]o move the United States toward greater energy independence and security, to increase the production of clean renewable fuels, to protect consumers, to increase the efficiency of products, buildings, and vehicles, to promote research on and deploy greenhouse gas capture and storage options, and to improve the energy performance of the Federal Government." Pub. L. No. 110–140, 121 Stat. 1492 (2007). EPA posted notice of the final revisions to the regulations promulgated under the 2005 Act on its website on February 3, 2010 and published the revised regulations in the Federal Register on March 26, 2010. *Regulation of Fuels and Fuel Additives: Changes to Renewable Fuel Standard Program*, 75 Fed. Reg. 14,670 (Mar. 26, 2010) ("Final Rule").

Petitioners, the National Petrochemical and Refiners Association and the American Petroleum Institute, challenge the Final Rule on three grounds. They contend that it violates statutory requirements setting separate biomass-based diesel volume requirements for 2009 and 2010; it is impermissibly retroactive; and it violates statutory lead time and compliance provisions. For the following reasons, we deny the petitions for review.

**I.**

In 2005 Congress amended section 211 of the Clean Air Act that authorizes EPA to regulate fuel and fuel additives to establish a renewable fuel program. *See* Pub. L. No. 109–58, § 1501, 119 Stat. 594 (codified at 42 U.S.C. § 7545(o)). For each year from 2006 until 2012, Congress specified increasing minimum volumes of renewable fuel to be used annually. EPA was directed to promulgate regulations by August 8, 2006 "to ensure that gasoline sold or introduced into commerce in the United States . . . , on an annual average basis, contains the applicable volume of renewable fuel determined in accordance with subparagraph (B)."[1] Subparagraph (B) listed the applicable volumes of renewable fuel that "shall be determined in accordance with" a table stating a volume for each calendar year.[2] The regulations were to include a credit trading program

---

[1] 42 U.S.C. § 7545(o)(2)(A)(i) (2005 Act).

[2] Under the 2005 Act, subparagraph (B) provided:

> For the purpose of subparagraph (A), the applicable volume for any of calendar years 2006 through 2012 shall be determined in accordance with the following table:

in billions of gallons, 4.0 in 2006; 4.7 in 2007; 5.4 in 2008; 6.1 in

under which an obligated party: (1) may generate credits for over complying with its annual obligation, and can use or trade these credits for use by another obligated party, allowing an obligated party to comply in the most cost effective manner, and (2) may carry over a renewable fuel deficit to the next calendar year.[3] "Regardless of the date of promulgation,"[4] the regulations were to contain provisions to "ensure" the requirements of the renewable fuel program were met, without restricting geographic areas in which such fuel may be used or imposing any per-gallon obligation for use of such fuel.[5] If the August 8, 2006 date was not met, then a default percentage standard for 2006 of 2.78 percent would apply.[6]

---

2009; 6.8 in 2010; 7.4 in 2011; 7.5 in 2012. 42 U.S.C. § 7545(o)(2)(B)(i).

[3] 42 U.S.C. § 7545(o)(5)(D) (2005 Act). The deficit carryover provision of the 2005 Act required the regulations to:

> allow[] any person that is unable to generate or purchase sufficient credits to meet the requirements of paragraph (2) to carry forward a renewable fuel deficit on condition that the person, in the calendar year following the year in which the renewable fuel deficit is created –
> > (i) achieves compliance with the renewable fuel requirement under paragraph (2); and
> > (ii) generates or purchases additional renewable fuel credits to offset the renewable fuel deficit of the previous year.

*Id.*

[4] 42 U.S.C. § 7545(o)(2)(A)(iii) (2005 Act).

[5] 42 U.S.C. § 7545(o)(2)(A)(iii)(I) & (II) (2005 Act).

[6] 42 U.S.C. § 7545(o)(2)(A)(iv) (2005 Act).

Obligated parties — refiners, importers, and certain blenders of gasoline — had to show that they had introduced a required volume of renewable fuel into the domestic gasoline pool each year.[7] The volume is determined by multiplying an obligated party's actual annual gasoline production in a given year by a percentage standard to be calculated and published by EPA by November 30 prior to each compliance year.[8] The percentage standard is the ratio of the statutory volume of renewable fuel for the particular year to the amount of gasoline that is projected to be used in the United States in the same year, subject to certain adjustments.[9] Ultimately, each obligated party is responsible for ensuring that its share of the overall renewable fuel volume requirement is blended into the gasoline it sells or introduces into commerce each year.

EPA published the implementing regulations in the Federal Register on May 1, 2007. *Regulation of Fuels and Fuel Additives: Renewable Fuel Standard Program*, 72 Fed. Reg. 23,900 (May 1, 2007) ("RFS1"). The regulations applied to gasoline produced or imported on or after September 1, 2007. RFS1, 72 Fed. Reg. at 23,913. As of that date, obligated parties

---

[7] 42 U.S.C. § 7545(o)(3)(B)(ii) (2005 Act).

[8] The 2005 Act provided, in pertinent part:

Not later than November 30 of each . . . year . . . based on the estimate provided under subparagraph (A), . . . [EPA] shall determine and publish in the Federal Register, with respect to the following calendar year, the renewable fuel obligation that ensures that the requirements of paragraph (2) are met.

42 U.S.C. § 7545(o)(3)(B)(i).

[9] 42 U.S.C. § 7545(o)(3)(B)(ii)(II) & (III) (2005 Act); *id.* § 7545(o)(3)(C) (2005 Act).

had to be registered and the record-keeping responsibilities commenced. EPA stated that the renewable fuel program adopted in the RFS1 rulemaking "will continue to apply after 2012, though some elements may be modified in the rulemaking setting the standards for 2013 and beyond." *Id.* at 23,913. To facilitate compliance, EPA adopted a system of Renewable Identification Numbers ("RINs") for reporting purposes. *Id.* at 23,908–10. Thus, obligated parties would demonstrate their compliance with the annual volume standard by acquiring RINs for each gallon of renewable fuel, which would be assigned to batches of renewable fuel produced or imported into the United States, with different fuels carrying different values based on the energy content relative to ethanol. *See id.* at 23,909.

When Congress expanded the renewable fuel program in 2007 in the EISA, Pub. L. No. 110–140, §§ 201–204, 121 Stat. 1492, it significantly increased the applicable volumes of renewable fuel required to be used annually, beginning with 2008 through 2022.[10] In other major changes, it expanded the fuel pool subject to the standards to include diesel and some non-road fuels.[11] It separated the volumes into four categories (cellulosic biofuel, biomass-based diesel, advanced biofuel, and total renewable fuel) for purposes of reducing greenhouse gas emissions and set annual volume requirements for each

---

[10] Subparagraph (B) under the EISA, which retained the "shall be determined" phrasing in the 2005 Act, *supra* note 2, listed the total renewable fuel volume, in billions of gallons, as 9.0 in 2008; 11.1 in 2009; 12.95 in 2010; 13.95 in 2011; 15.2 in 2012; 16.55 in 2013; 18.15 in 2014; 20.5 in 2015; 22.25 in 2016; 24.0 in 2017; 6.0 in 2018; 28.0 in 2019; 30.0 in 2020; 33.0 in 2021; 36.0 in 2022. *See* 42 U.S.C. § 7545(o)(2)(B)(i)(I).

[11] 42 U.S.C. § 7545(o)(2)(A)(i); *id.* § 7545(o)(1)(L).

category.[12] It also changed the definition of "renewable fuel" and set the criteria for determining which of the four renewable fuel categories a given renewable fuel is eligible to meet; "renewable fuel" was defined to require that such fuel be produced solely from feedstocks that qualify as "renewable biomass."[13] Although the definitions of each of the four categories of fuel overlap to a certain extent (therefore satisfying one volume requirement also satisfies other volume requirements in part), refiners, importers and certain blenders of gasoline are obligated to demonstrate that they have introduced the requisite volumes of each of the four categories of fuel into transportation fuel sold annually. The EISA authorized the waiver of the volume requirements only in limited circumstances.[14] The

---

[12] 42 U.S.C. § 7545(o)(2)(B).

[13] 42 U.S.C. § 7545(o)(1)(J).

[14] The waiver provision provided, in pertinent part, that, in general, the EPA Administrator ("EPA"), in consultation with the Secretaries of the Agriculture and Energy Departments

> may waive the requirements of paragraph (2) in whole or in part . . . by reducing the national quantity of renewable fuel required under paragraph (2) --
>
> (i) based on a determination by [EPA], after public notice and opportunity for comment, that implementation of the requirement would severely harm the economy or environment of a State, region, or the United States; or
> (ii) based on a determination by [EPA], after public notice and opportunity for comment, that there is an inadequate domestic supply.

42 U.S.C. § 7545(o)(7)(A). A waiver is good for one year. *Id.* § 7545(o)(7)(C). The waiver provision also provided that the biomass-based diesel volume requirements may be temporarily

revised regulations were to be promulgated in one year, by December 19, 2008[15]; the requirement that the volume standard be published by November 30 of the prior year remained unchanged.

By Notice of November 21, 2008, EPA published the renewable fuel standard for 2009. *See Renewable Fuel Standard for 2009, Issued Pursuant to Section 211(o) of the Clean Air Act*, 73 Fed. Reg. 70,643, 70,643 (Nov. 21, 2008) ("2008 Notice"). Additionally, the Notice stated, because EPA was not going to meet the December 19, 2008 deadline for promulging the revised regulations, that "for the 2009 compliance period regulated parties will continue to be subject to the existing RFS1 regulations at 40 C.F.R. part 80, Subpart K." *Id.* EPA would apply the modified volume requirements under the EISA to generate the 2009 standard. *See id.* The Notice also stated, because "the RFS1 regulatory structure does not provide a mechanism for implementing the [new] EISA requirement for use of 0.5 billion gallons of biomass-based diesel," *id.*, that the future rulemaking proposal would "propose options," *id.* EPA

---

reduced "if [EPA] determines that there is a significant renewable feedstock disruption or other market circumstances that would make the price of biomass-based diesel fuel increase significantly." *Id.* § 7545(o)(7)(E)(ii). *See also id.* § 7545(o)(7)(F).

[15] The EISA provided, in pertinent part:

Not later than 1 year after December 19, 2007, [EPA] shall revise the regulations under this paragraph to ensure that transportation fuel sold or introduced into commerce in the United States . . ., on an annual average basis, contains at least the applicable volume of renewal fuel . . . , determined in accordance with subparagraph (B) . . . ."

42 U.S.C. § 7545(o)(2)(A)(i).

advised that "[t]he primary approach for proposal that [it had] identified to date would be to increase the 2010 biomass-based diesel requirement by 0.5 billion gallons and allow 2009 biodiesel and renewable diesel RINs to be used to meet this combined 2009/2010 requirement." *Id.* "Such an approach to biomass-based diesel," EPA explained, "would provide a similar incentive for biomass-based diesel use in 2009 as would have occurred had [EPA] been able to implement the standard for 2009." *Id.* "While obligated parties would not need to demonstrate compliance with the combined 2009/2010 biomass-based diesel standard until the end of the 2010 compliance period under this approach," EPA advised that "it would behoove them to acquire the necessary RINs representing biodiesel and renewable diesel in 2009 in preparation for their 2010 compliance demonstration." *Id.*

On May 26, 2009, EPA published a notice of proposed rulemaking incorporating the EISA's changes to the renewable fuel program into a modified regulatory scheme (hereinafter referred to as RFS2). *Regulation of Fuels and Fuel Additives: Changes to Renewable Fuel Standard Program*, 74 Fed. Reg. 24,904 (May 26, 2009) ("NPRM"); *see id.* at 24,957. EPA stated that the proposed RFS2 program was based on its experience with the RFS1 program, "utilizing and building on the same programmatic structure created to implement the current [RFS1] program." *Id.* at 24,909. Thus, while "[t]he proposed regulations make a number of changes to the current Renewable Fuel Standard program," the RFS2 program would "retain[] many elements of the compliance and trading system already in place." *Id.* at 24,904. EPA proposed combining the 2009 and 2010 biomass-based diesel statutory volume requirements to create one 2010 standard, and allowing obligated parties to demonstrate their compliance with the 2010 biomass-based diesel standard on February 28, 2011, *see id.* at 24,959. EPA also indicated that it would retain the RIN system developed in RFS1,

as modified to accommodate the additional renewable fuels and other changes made in the EISA, *see id.* at 24,910. This approach, EPA explained, was "in keeping with [its] overall intent for RFS1 — to design a flexible and enforceable system that could continue to operate effectively regardless of the level of renewable fuel use or market conditions in the transportation fuel sector." *Id.* at 24,909.

The NPRM stated that the revised regulations would take effect January 1, 2010. *Id.* at 24,913. EPA advised, however, that it was unable to promulgate the revised regulations by the statutory date, December 19, 2008. *See id.* EPA pointed specifically to delays caused by "the addition of [the greenhouse gas] complex lifecycle assessments to the determination of eligibility of renewable fuels [to meet the standards for the four fuel categories], the extensive analysis of impacts [being] conduct[ed] for the higher renewable fuel volumes, the various complex changes to the regulatory program [relating to the RINs and IT technology] that require close collaboration with stakeholders, and various statutory limitations such as . . . a 60 day Congressional review period for all significant action." *Id.*[16]

---

[16] The Congressional Review Act requires a period of 60 days for congressional review of a "major rule." 5 U.S.C. § 801(a)(3) (2006). A "major rule" is defined, as relevant, as any rule that the Office of Management and Budget finds has resulted in or is likely to result in--

(A) an annual effect on the economy of $100,000,000 or more;
(B) a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; or
(C) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based

11

EPA alerted obligated parties, much as it had in the 2008 Notice, that although "[f]or the remainder of 2009, the current RFS1 regulations would apply," "in anticipation of the biomass-based diesel standard proposed for 2010, obligated parties may find it in their best interest to plan accordingly in 2009." *Id.* at 24,908.

EPA promulgated the final revised regulations on February 3, 2010 and posted notice of the 2010 standards on its website the same day,[17] and published the Final Rule in the Federal Register on March 26, 2010. The Final Rule made few changes to the NPRM.[18] Thus, obligated parties were required to use

enterprises in domestic and export markets.

*Id*. § 804(2) (2006). The term "rule" has the meaning given in section 551 with exceptions not relevant here. *Id*. § 804(3).

[17] *See* EPA Regulatory Announcement: EPA Finalizes Regulations for the National Renewable Fuel Standard Program for 2010 and Beyond (Feb. 2010), http://www.epa.gov/oms/renewablefuels/420f10007.pdf; http://www.epa.gov/oms/whatsnew.htm. (Feb. 3, 2010).

[18] For example, the Final Rule adjusted the value of the biomass-based diesel volume requirement "upward by a factor of 1.5, the Equivalence Value for biodiesel," to ensure the mandated gallons were used. Renewable Fuel Standard Program (RFS2) Summary and Analysis of Comments: Chapter 3, Major Elements of the Program Required Under EISA 3.6.2 (Feb. 2010). EPA interpreted the EISA to require the biomass-based diesel volumes be met only with renewable fuels that displace fossil-based diesel. *See id.* The biomass-based diesel standard for 2010 was projected in the NPRM to be .71%, while it was set in the Final Rule at 1.10%. *See* NPRM, 74 Fed. Reg. at 24,915; Final Rule, 75 Fed. Reg. at 14,675. EPA treated the biomass-based diesel volume requirement as a diesel volume, not an ethanol-equivalent volume (which is the basis for the equivalence values), and adjusted its percentage standard by a factor

1.15 billion gallons of biomass-based diesel based on the combined volume requirements for 2009/2010, with a deferred compliance date. The Final Rule also set the final 2010 percentage standards for cellulosic biofuel, advanced biofuel, and total renewable fuel based on the statutory tables of applicable volumes for those fuels, in view of available volumes. 75 Fed. Reg. at 14,675. Obligated parties were required to apply these percentage standards to their 2010 production or importation of gasoline and diesel fuel to calculate their renewable volume obligation for 2010. *Id.* at 14,676. As a transition measure, obligated parties were allowed to use RINs generated under the RFS1 program in 2009 and in the first part of 2010 to meet the 2010 RFS2 renewable volume obligations, even though these RFS1 RINs may have been generated for fuel that did not meet the EISA's new greenhouse gas reduction and renewable biomass requirements. *Id.* at 14,723, 724. With certain limitations, parties also could use 2008 RINs to comply with the 2010 biomass-based diesel standard.[19] *Id.* at 14,719.

_____

of 1.5 (changing it from .71% to 1.10%). EPA explained in the Final Rule that "[t]he net result is a biomass-based diesel gallon being worth 1.0 gallons toward the biomass-based diesel standard, but 1.5 gallons toward the other [fuel] standards." 75 Fed. Reg. at 14,716. Because this was the first time a percentage standard was set for biomass-based diesel and biomass-based diesel continues to be worth 1.5 gallons for all of the other fuel standards, the Final Rule made no change in equivalence values for biodiesel from the RFS1 regulations. Further, because the biomass-based diesel standard changed only to account for the 1:1 equivalence value, the biomass-based diesel standard in the Final Rule does not meaningfully differ from the proposed standard in the NPRM.

[19]  Under the Final Rule, obligated parties can carryover 57% of their 2010 obligation. The remaining 43% represents the portion of that obligation necessary to ensure use of the 2009 applicable volume, and must be satisfied in 2010. 75 Fed. Reg. 14,719.

The compliance date for the combined 2009/2010 volume requirement was February 28, 2011, the end of the 2010 compliance year. *Id.* at 14,676. The effective date of the Final Rule was July 1, 2010, "the start of the first [reporting] quarter following completion of the statutorily required 60-day Congressional Review period" for a "major rule." *Id.* at 14,675.[20]

EPA explained in the preamble that, in contrast to the alternatives proposed by commenters, it had adopted the combined 2009/2010 approach because it "more closely represent[ed] what would have occurred if [EPA] had been able to implement the 0.5 bill[ion] gal[lon] requirement in 2009." *Id.* at 14,719. This was, EPA stated, "a reasonable exercise of [its] authority under section [7545](o)(2) to issue regulations that ensure that the volumes for 2009 are ultimately used, even though [EPA was] unable to issue final regulations prior to the 2009 compliance year." *Id.* at 14,718. EPA observed that "the deficit carryover provision provides a conceptual mechanism for this approach, since it would have allowed obligated parties to defer compliance with any or all of the 2009 standards until 2010." *Id.* at 14,718. [21]

---

[20] *See supra* note 16.

[21] By notice of May 10, 2010, EPA, responding to critical comments, published a "direct final rule" to amend the RFS2 program requirements, withdrawing provisions regarding definition of terms, the technical requirements for generating and coding of RINs and transactions involving RINs, and the requirements for a fuel to be considered a biogas for coding purposes. *Regulation of Fuels and Fuel Additives: Modifications to Renewable Fuel Standard Program*, 75 Fed. Reg. 37,733, 37,733 (June 30, 2010). Petitioners do not rely on these changes in challenging the Final Rule.

**II.**

Petitioners contend that the Final Rule violates the clear statutory mandate in 42 U.S.C. § 7545(o)(2)(B) that the biomass-based diesel requirement for 2010 "shall" be 0.65 billion gallons by imposing a combined 2009/2010 requirement of 1.15 billion gallons. Congress' use of the word "shall" has a clear meaning, they maintain, citing *Lopez v. Davis*, 531 U.S. 230, 241 (2001), for the proposition that "shall" imposes "discretionless obligations." Having missed the statutory deadline of December 19, 2008 by which Congress directed that EPA "shall" publish the revised regulations for the 2009 requirement, petitioners conclude that EPA lacked authority to increase the 2010 volume requirement to include the 2009 volume requirement. In their view, Congress' specific directive for 2010 overrides EPA's general rulemaking authority, and nothing in the deficit carryover provision[22] suggests that EPA has authority to carryover a renewable fuel requirement from 2009 into 2010. Put otherwise by intervenors representing the biodiesel industry and ethanol producers, petitioners urge that because the EISA provides that EPA "shall" issue regulations by December 19, 2008 and "shall" publish the renewable volume standard by November 30 of the prior year, "EPA's failure to do so requires it to ignore its obligations under [the EISA] to ensure that the renewable fuel requirements for 2009 and part of 2010 are satisfied." Intvrs.' Br. 13. EPA offers two responses, pointing to its mandate under section 7545(o)(2)(A)(i) to "ensure" that "at least" the statutory volumes are used, and to the reasonableness of its response to missing the statutory deadlines.

We begin with the text of the statute to determine whether Congress has spoken directly to the precise issue. *See generally Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002);

---

[22]  42 U.S.C. § 7545(o)(5)(D); *see supra* note 3 (2005 Act).

*Chevron USA v. NRDC*, 467 U.S. 837, 842 (1984); *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1084 (D.C. Cir. 1996). Section 7545(o)(2)(A)(i) provides that EPA

> shall promulgate regulations *to ensure* that transportation fuel sold or introduced into commerce in the United States . . . , on an annual average basis, contains *at least* the applicable volume of renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel, determined in accordance with subparagraph (B) . . . .

42 U.S.C. § 7545(o)(2)(A)(i) (emphasis added). The "ordinary or natural meaning," *Bailey v. United States*, 516 U.S. 137, 145 (1995) (internal citation omitted), of the word "ensure" is "to make sure, [or] certain," MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 386 (10th ed. 1993). Congress thus delegated authority to EPA to make certain that the 2009 applicable volume of each type of renewable fuel is sold or introduced into commerce. Further, as EPA observes, petitioners' contention that Congress has not delegated authority to EPA to use anything other than the 0.65 billion gallons of biomass-based diesel in setting the 2010 standard — i.e., that the general authority in section 7545(o)(2)(A)(i) cannot increase the 2010 statutory amount set in section 7545(o)(2)(B)(i)(IV) — overlooks the phrase "at least" and the ambiguity it creates regarding EPA's determination of the 2010 standard for biomass-based diesel.[23]

---

[23] EPA and intervenors also rely on 42 U.S.C. § 7545(o)(2)(A)(iii), as amended in 2007, which provides:

> Regardless of the date of promulgation, the regulations promulgated under clause (i) –
> > (I) shall contain compliance provisions applicable to refineries, blenders, distributors, and importers, as

Petitioners object that EPA is suggesting for the first time on appeal that the statutory text is ambiguous and, consequently, the court owes no deference to this *post hoc* rationale, citing *City of Kansas City v. HUD*, 923 F.2d 188, 192 (D.C. Cir. 1991). They maintain that the statutory text must be interpreted so it does not conflict with other statutory provisions, *see, e.g.*, *Ricci v. DeStefano*, 129 S. Ct. 2658, 2674 (2009), and that the clear text and statutory structure of the EISA undermine EPA's position. They also suggest that the phrase "at least" can "readily" be interpreted to avoid a conflict with the specific volume requirements (implicitly appearing to agree that the phrase is ambiguous) by interpreting "at least" to mean that "transportation fuel contains no less *and no more* than the applicable volume." Reply Br. 7 (emphasis in original). Further, they continue, the reference to "subparagraph (B)" in section 7545(o)(2)(A)(i) confirms that the "at least" phrase does not authorize EPA to disregard the provisions of subparagraph (B), wherein the "shall" directive is found for the annual volume requirements. They note that Congress used clear statutory language in the waiver provision to grant EPA authority to

> appropriate, to ensure that the requirements of this paragraph are met; but
> (II) shall not–
>> (aa) restrict geographic areas in which renewable fuel may be used; or
>> (bb) impose any per-gallon obligation for the use of renewable fuel.

Clause (i), as amended by the EISA, refers to regulations to be promulgated one year after August 8, 2005 and the revised regulations to be promulgated not later than one year after December 19, 2007. Petitioners reply only that EPA properly did not rely on this provision in promulgating the Final Rule because it does not provide authority for EPA to increase the 2010 statutory volume of biomass-based diesel.

decrease the statutory volume requirements in particular circumstances[24] but omitted any similar provision to grant EPA the authority to increase the 2010 biomass-based diesel volume requirements.

Congress did not state in the EISA what would happen if EPA failed to meet the statutory deadline for promulgating the revised renewable fuel regulations on the increased 2009 volume requirements. Although it had provided in the 2005 Act that a default standard would apply in 2006 if the initial regulations were not promulgated by the statutory deadline of August 8, 2006,[25] Congress included no similar provision when it expanded the renewable fuel program in the EISA. Neither did it provide that the 2009 volume requirements should be forgone if EPA did not promulgate the revised regulations "by one year," or December 19, 2009. Similarly it made no such provision if the 2010 standard deadline was missed. Precedent from the Supreme Court and this court instructs, however, that where there are less drastic remedies available for an agency's failure to meet a statutory deadline, courts should not assume Congress intended for the agency to lose its power to act. *See, e.g.*, *Brock v. Pierce County*, 476 U.S. 253, 260 (1986). Petitioners' response, that EPA cannot ignore that the volume requirement set by Congress for 2010 is 0.65 billion gallons, fails to address this precedent and is unsupported by the case law.

Contrary to the core of petitioners' position, the Supreme Court has declined to treat a statutory direction that an agency "'shall' act within a specified time, without more, as a jurisdictional limit precluding action later." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 158 (2003) (citing *Brock*, 476 U.S. 253);

---

[24] *See supra* note 14.

[25] *See supra* note 6.

*see also Dolan v. United States*, 130 S. Ct. 2533, 2538–41 (2010). In *Barnhart*, the Court held that an initial assignment of a coal industry retiree eligible for benefits to an operating company or related entity responsible for funding the benefits was valid although made after the statutory date by which the Commissioner of Social Security "shall" make the assignment. The Court observed that "[i]t misses the point simply to argue that the [statutory date] was 'mandatory,' 'imperative,' or a 'deadline,' as of course it was, however unrealistic the mandate may have been." *Id.* at 157. Citing *Brock*, the Court noted that it had "expressed reluctance 'to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake.'" *Id*. at 158 (quoting *Brock*, 476 U.S. at 260). The Court had summarized its position a decade earlier: "'if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction.'" *Id*. at 159 (quoting *United States v. James Daniel Good Real Property*, 510 U.S. 43, 63 (1993)). Additionally, the Court noted, the statute at issue was enacted after *Brock* was decided, when "Congress was presumably aware that we do not readily infer congressional intent to limit an agency's power to get a mandatory job done merely from a specification to act by a certain time." *Id*. at 160. The Court found nothing in the statutory text to support the conclusion that the Commissioner lacked authority to act after the date passed, and nothing in the structure, purpose, and legislative history to the contrary. *Id.* at 161.

*Brock*, 476 U.S. 253, is both illustrative and instructive. The Comprehensive Education Training Act ("CETA") provided that the Secretary of Labor "shall" issue a final determination as to the misuse of CETA funds by a grant recipient within 120 days of receiving a complaint. 29 U.S.C. § 816(b) (Supp.V 1976) (repealed 1982). Pierce County objected that it was prejudiced

when the final determination occurred after 120 days. Upon examining the statute and its legislative history, the Supreme Court concluded that Congress did not intend the "somewhat incongruous result" that the Secretary would lose authority to recover misspent funds 120 days after learning of the misuse. *Id.* at 258. Observing that the harm to the Federal Treasury was "a matter . . . of interest to every citizen," *id.* at 262, the Court instructed that when "there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act." *Id.* at 260. In explaining its "reluctan[ce] to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action," *id.*, the Court referred to "'the great principle of public policy, applicable to all governments alike, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided.'" *Id.* (internal citations omitted). The Supreme Court applied *Brock*'s teaching in *General Motors Corp. v. United States*, 496 U.S. 530, 542 (1990), upholding EPA's authority to bring an enforcement action under the Clean Air Act after the statutory deadline had passed. *Lopez*, 531 U.S. at 241, on which petitioners rely, addresses a different statutory issue and casts no doubt on this precedent.

In keeping with Supreme Court precedent, this court in *Linemaster Switch Corp. v. EPA*, 938 F.2d 1299 (D.C. Cir. 1991), upheld EPA's listing of hazardous waste sites after the statutory deadline had passed. *See* 42 U.S.C. § 9605(c)(1) (1986). EPA had developed the new hazardous ranking system ("HRS") almost 29 months after the statutory deadline. Between the listing deadline and the effective date of the HRS, EPA added 71 sites to the National Priorities List, using the old HRS criteria. Observing that the provision imposing the deadline included no consequences for failure to comply with it, the court declined to resolve the statutory ambiguity through resort to deference under

*Chevron*, 467 U.S. 837, stating "it would indeed be odd to conclude that Congress implicitly entrusted a laggard agency with the authority to devise a remedy for its own untimeliness," *Linemaster Switch*, 938 F.2d at 1303. Instead, the court determined for itself what Congress would have intended in enacting a statute "to ensure that an amended [listing] would 'accurately assess[] the relative degree of risk'" presented by sites potentially subject to being listed. *Id.* (internal citation omitted). The court upheld EPA's authority to act after the statutory deadline had passed, looking to the legislative history that indicated "the strong public interest in EPA's ongoing identification of sites for . . . listing, combined with Congress' accommodation of the private interests potentially harmed by [inaccurate listings] and its contemplation of citizen suits as a remedy for EPA non-compliance [with deadlines]." *Id.*

This precedent from the Supreme Court and our court thus makes clear that in the face of congressional silence in the EISA on the effect of EPA's delay in promulgating the revised regulations, we should not presume Congress intended EPA would lose authority to act upon missing statutory deadlines but must determine, *see Barnhart*, 537 U.S. at 161, without deferring to *post hoc* arguments of counsel, *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983), what Congress would have intended when EPA missed a statutory deadline in the EISA. The self-evident purpose of the EISA permits EPA's action in promulgating the Final Rule in order "to ensure" the volume of biomass-based diesel required for 2009 is not forgone. Congress enacted the EISA to expand the renewable fuel program under the 2005 Act in order "to increase the production of clean renewable fuels." Pub. L. No. 110–140, 121 Stat. 1492. It tied this expansion to, among other things, the nation's security, *see id.*, a "matter . . . of interest to every citizen," as harm to the Federal Treasury was in *Brock*, 476 U.S. at 262. *See also* NPRM, 73 Fed. Reg. at 24,916. By including

the authorizing phrase "at least" Congress also signaled its intent that volumes not be reduced, at least not in the first decade of the renewable fuel program. The structure of the statute and the absence of a default standard for 2010 furthermore suggest that Congress envisioned a smooth transition through the revised renewable fuel regulations, from the 2005 Act's renewable fuel program (RFS1) to the EISA's expansion of it (RFS2). Understandably, perhaps, there thus is scant legislative history for the EISA.

The rulemaking record suggests, moreover, that the deadlines in the EISA for promulgating the revised regulations and the 2010 standard were likely unrealistic. *See Barnhart*, 537 U.S. at 157. The President signed the EISA into law on December 19, 2007. Final revised regulations were due in a year. Yet the EISA included several "new, complex provisions." NPRM, 74 Fed. Reg. at 24,909. A stated purpose of the EISA was "to promote research on and deploy greenhouse gas capture and storage options." Pub. L. No. 110–140, 121 Stat. 1492. EPA noted that the provision on the greenhouse gas impact of renewable fuels required "a comprehensive evaluation of renewable fuels, as well as of gasoline and diesel, on the basis of their lifecycle emissions," NPRM, 74 Fed. Reg. at 24,909, including "direct and indirect emissions" and "significant emissions from land use changes," *id.* By May 26, 2009, EPA had conducted its analyses, but because lifecycle analysis was a new part of the renewable fuel program, EPA determined it should solicit public and expert comment in addition to the formal comment period on the proposed rule, and intended to do so at a forthcoming public workshop and by peer reviews of key components of its analysis, all before the final rule was adopted. *See id.*

Under the circumstances, Congress' purpose in expanding the renewable fuel program under the EISA is better served by

EPA's approach in the Final Rule than it would be by forgoing the 2009 applicable volume requirement as petitioners propose. Congress required a biomass-based diesel program beginning January 1, 2009, with a volume mandate of 0.5 billion gallons, and it directed EPA to "ensure" that volume would be used in 2009. It also directed EPA to "ensure" that "at least" the set volumes were used each year. EPA's 2009/2010 solution to account for its delay reflects Congress' vision in expanding the renewable fuel program without rendering nugatory the EISA's restrictions on EPA's authority to revise the volume requirements as such. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 484–85 (2001). It seems highly unlikely that in 2007 Congress intended in enacting the EISA that EPA's failure timely to issue the revised regulations or the 2010 standard would lead to the drastic and "somewhat incongruous result," *Brock*, 476 U.S. at 258, that petitioners urge, namely precluding EPA from ensuring that both the 2009 and 2010 applicable volumes of biomass-based diesel are eventually sold or introduced into commerce. As EPA suggests, "such a result seems flatly contrary to Congress' intent and would turn agency delay into a windfall for the regulated entities." Respt.'s Br. 31.

Petitioners' arguments to the contrary are unpersuasive. They maintain that nothing in the EISA's structure indicates EPA can increase the applicable volume of biomass-based diesel above 0.65 billion gallons for 2010, and that the grant of express authority to waive applicable volumes is limited by specific criteria. But EPA relies not on general structure but on its express authority under section 7545(o)(2)(A)(i). *See* 75 Fed. Reg. at 14,718. Congress mandated EPA to "ensure" that obligated parties sell or introduce into commerce the 2009 applicable volumes of biomass-based diesel and the only question is how EPA may exercise that authority when it misses the statutory deadline for promulgating the implementing regulations. Nothing in the waiver provision suggests anything

negative about EPA's authority to ensure 2009 applicable volumes are used, even if EPA acts after the statutory deadline, a situation not addressed in the waiver provision. Indeed intervenors suggest that the restrictions in the waiver provision "reinforce[] how serious Congress was about compliance with [the EISA's] annual volume requirements, and further establishes that EPA could not ignore the 2009 mandate." Intvrs.' Br. 20.

Likewise, petitioners' focus on Congress' use of the word "shall" in the tables setting the 2009 and 2010 volumes overlooks the authority Congress granted to EPA to ensure compliance with those volumes by providing that EPA ensure that "at least" the applicable volume is used each year. They offer no explanation why the same use of "shall" in connection with the 2009 volume requirement means nothing, while its use for 2010 means so much.

In urging that by delineating the years in which EPA can specify an applicable volume "Congress reinforced the conclusion that EPA is *not* authorized to disregard Congress's specific instruction that [EPA] 'shall' impose a 0.65 billion gallon biomass-based diesel mandate in 2010," Petrs.' Br. 25 (emphasis in the original), petitioners create a straw man. EPA is not asserting authority to establish any applicable volume it considers appropriate; it disclaimed such authority when that suggestion was made, *see* RFS2 Summary and Analysis of Comments, Section 3.6.2. Rather, EPA incorporated into the 2010 standard the mandated 2009 applicable volume of renewable fuel that otherwise would not be used.

Petitioners also maintain that the deficit carryover provision, as a "conceptual mechanism," 75 Fed. Reg. at 14,718, is not an express authorization for EPA to combine two years of applicable volumes. Intervenors suggest this puts form over substance. EPA, in any event, considered the deficit carryover

provision, which generally permits obligated parties to defer compliance with one year's obligations to the following year, only as a model to support by analogy the reasonableness of the approach it adopted for satisfying the statutory directive to "ensure" use of the 2009 volumes where the renewable fuel standard was not published until 2010. *See id.* By not relying on the deficit carryover requirements, EPA afforded obligated parties more time for the 2009/2010 volume in the event they did not actually purchase and use the required volumes of biodiesel in 2009. *Id.* at 14,719. Thus, intervenors note, petitioners are better off under the Final Rule than they would be had EPA implemented the EISA's expanded renewable fuel program on time. As intervenors suggest, under EPA's approach the 2010 statutory volume remains 0.65 billion gallons, as EPA merely postponed the compliance date for the statutory 2009 volume.

The cases on which petitioners rely are inapposite. In *Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, 142 (D.C. Cir. 2006), the court held that EPA lacked authority to set seasonal or annual loads for discharge standards for certain pollutants when the Clean Water Act mandated "daily" loads. In *American Petroleum Institute v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir 1995), the court similarly held that nothing in the Clean Air Act gave EPA authority to require a percentage of the oxygen in reformulated gasoline come from renewable sources. Neither of these situations is comparable to the instant case where EPA is following Congress' direction to "ensure" the mandated fuel volumes are met. In those cases, unlike here, there was no gap in the statute for EPA to fill. Petitioners' reliance on the court's observation in *NRDC v. Thomas*, 805 F.2d 410, 435 (D.C. Cir. 1986), that "two wrongs do not make a right," thus misses the mark.

We therefore hold that the EISA authorized EPA to apply in 2010 the volume requirement for biomass-based diesel that

Congress established for 2009. Absent Congress' provision for a loss of authority as a result of delay, the purpose and structure of the EISA are contraindications of a congressional intent to divest EPA of authority to act when it missed, due in part to carrying out the EISA's directives, the statutory deadlines for revising the RFS1 regulations and setting biomass-based diesel standards for 2009 and 2010.

**III.**

Petitioners also contend that by imposing renewable fuel standards that became effective in July 2010 but that apply to 2010 as a whole, the Final Rule is impermissibly retroactive. They point to the definition of "rule" in the Administrative Procedure Act as "the whole or a part of an agency statement of general or particular applicability and *future effect,*" 5 U.S.C. § 551(4) (emphasis added), and to the "deeply rooted" presumption that "'the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place,'" *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994) (internal citation omitted). They note the Supreme Court's admonition that "[e]ven where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208–09 (1988). EPA responds that, even assuming the Final Rule has retroactive effects, Congress expressly and impliedly authorized this result by directing EPA to "ensure"[26] the specified renewable fuel volume requirements are sold or introduced into commerce on an average basis, and also by requiring EPA to do so "regardless of the date of promulgation"[27]

---

[26] *See supra* note 15.

[27] *See supra* note 23.

of the necessary implementing regulations. To the extent the Final Rule may be retroactive, we hold that EPA did not exceed its authority under the EISA.

**A**.

In determining whether a statute or regulation has retroactive effect, the court considers among other things "whether it would . . . impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280; *see Boniface v. U.S. Dep't of Homeland Sec.*, 613 F.3d 282, 288 (D.C. Cir. 2010). This court has recognized the distinction between a rule that imposes new sanctions on past conduct, which is retroactive and invalid unless specifically authorized, and one that merely "upsets expectations," which is secondarily retroactive and invalid only if arbitrary and capricious. *See Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 670–71 (D.C. Cir. 2009). *Landgraf*, on which petitioners rely, makes a similar distinction for statutes, stating that "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, . . . or upsets expectations based in prior law." 511 U.S. at 269 & 270 n.24 (internal citation omitted).

Petitioners contend that the Final Rule is impermissibly retroactive because as of July 1, 2010, when the Final Rule became effective, they were subjected to new duties or disabilities regarding past transactions when they were required to obtain RINs to demonstrate their compliance with the four renewable fuel standards based on their purchase or production of types of fuel that were finally identified in the Final Rule, *see* 75 Fed. Reg. at 14,676. They note that although the 2009 renewable fuel standard was (timely) published in the 2008 Notice, 73 Fed. Reg. at 70,644–45, EPA did not publish separate standards for biomass-based diesel, advanced biofuels, or cellulosic biofuels until the NPRM, 74 Fed. Reg. at 24,915, and

then adopted some changes with regard to fuel categories in the Final Rule, 75 Fed. Reg. at 14,675. They maintain that having until February 28, 2011 to obtain RINs does not cure the retroactivity problem because "it is the production or importation of transportation fuel that triggers the obligation [to] accumulate RINs." Petrs.' Br. 19. Consequently, petitioners state, "[p]rior to the promulgation of the [F]inal [R]ule, obligated parties lacked certainty regarding what renewable fuels EPA would consider to be compliant with RFS2 requirements (such as [greenhouse gas] thresholds established through lifecycle analysis)." Petrs.' Br. 32. Likewise they "lacked assurance that RINs they might accumulate prior to the issuance of a final rule would qualify under the RFS2 program." *Id.*

In the preamble, EPA stated that the Final Rule was not retroactive because its approach was forward looking because compliance with any new requirements would be determined in the spring of 2011. It also stated that the Final Rule does "not change in any way the legal obligations or requirements that apply prior to [the Final Rule's] effective date." 75 Fed. Reg. at 14,676. EPA does not defend this position on appeal, arguing instead that, assuming there were retroactive effects, it had authority to engage in retroactive rulemaking.

Intervenors, however, support EPA's regulatory position that the Final Rule is not retroactive, at least in a primary sense. They contend that "[o]bligated parties were fully aware of their statutory duty to acquire renewable fuels if they participated in the domestic market in 2009 or 2010," and "[t]o the extent the [RFS2] regulations impair the value of past bargains or alter their future legal effect (which is the crux of [p]etitioners' retroactivity allegation), they are not 'retroactive' within the meaning of the law that [p]etitioners cite." Intvrs.' Br. 25. Intervenors point out that the 2010 renewable volume requirements were set by the EISA in 2007, not in the RFS2

regulations, and that, contrary to petitioners' assertion that the 2010 renewable volume obligations create new obligations for transactions occurring before the Final Rule took effect, the law as it existed since January 1, 2009 is the RFS1 regulatory program under the 2005 Act, as amended in 2007 by the EISA.

Retroactivity as defined in *Landgraf*, as intervenors note, "turns on 'the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.'" Intvrs.' Br. 25 (citing 511 U.S. at 270). The EISA set forth the minimum annual volumes for each year, identified producers and importers of transportation fuel as obligated parties subject to those requirements, and defined transportation fuel to include both gasoline and diesel fuel.[28] In intervenors' view, petitioners' objections that their members "lacked certainty" and "lacked assurance" about the scope of their obligations under the EISA "all but undoes their retroactivity theory" because these objections do not show petitioners lacked notice of their obligations to fulfill the volume

---

[28] Thus, intervenors note,

[e]ven [p]etitioners' hypothetical fleeting diesel importer – who imported a million gallons of diesel and quit the business before the [RFS2] regulations were finalized in 2010 and who must now acquire some renewable fuels – cannot assert a legitimate expectation that its transaction would not be subject to the Renewable Fuel Standard.

Intvrs.' Br. 26 n.8. *See* Petrs.' Br. 33–34. The EISA applied to diesel importers and "put them on notice of their obligations under the statute," the only exceptions to these requirements in 2009 and 2010 being, intervenors note, for small refineries. Intvrs.' Br. 26 n.8 (citing 42 U.S.C. § 7545(o)(9)). Further, intervenors note, EPA provided notice and met with the petroleum industry throughout the rulemaking process. *See id.* (citing 75 Fed. Reg. at 14,673).

mandates. *Id.* at 27. Indeed, in *Landgraf* the Supreme Court suggested that the "familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance" on retroactivity. 511 U.S. at 270. Cases like *Bowen*, 488 U.S. 204, and *National Mining Ass'n v. Department of Labor*, 292 F.3d 849 (D.C. Cir. 2002), are distinguishable, as intervenors point out, as instances in which an agency "completely reversed the status quo ante." Intvrs.' Br. 27. Intervenors also point to industry comments indicating some obligated parties in fact began preparing for their 2010 obligations, citing comments by petitioners, Exxon, and Chevron, and demonstrating that the renewable fuel volume is "simply a formula (the required volume divided by the amount of applicable transportation fuel estimated to be sold) that can easily be estimated by obligated parties."[29] *Id*. 27–28. To intervenors, the fact that EPA had "to further define certain requirements regarding what RINs to purchase," does not show the Final Rule is retroactive because "the final renewable volume obligations are based on obligations previously created by statute and issuing [standards] without revision prior to November 30 is not a prerequisite to EPA's mandate to ensure the entire volumes are met." *Id.* at 28.

In *National Cable*, the court rejected a retroactivity challenge to a rule barring cable operators from entering exclusivity contracts for multi-unit dwellings and forbidding enforcement of such contracts executed before the rule was

---

[29] *See* formulas for calculating the percentage standards, EPA Memorandum on Calculation of the Renewable Fuel Standard for Gasoline and Diesel (Apr. 30, 2009). Intervenors explain that issuance of the final renewable fuel standard by November 30 of the prior year simply allows EPA to rely on the most recent estimates of next year's fuel production and use. *See* 42 U.S.C. § 7545(o)(3)(A); Intvrs.' Br. 28.

adopted. There it was argued that the agency's decision to apply its rule to existing contracts amounted to "'directly retroactive' action barred by the APA[]." 567 F.3d at 670 (internal citations omitted). Alternatively, it was argued that the rule had "harmful, secondarily retroactive effects that the [agency] failed to consider." *Id.* The court was unpersuaded, holding that "the [agency's] action has only 'future effect' as the APA and our precedents use that term." *Id.* Noting that "[t]he exclusivity ban purports to alter only the present situation, not 'the past legal consequences of past actions,'" the court emphasized that it has "repeatedly made clear that an agency order that only 'upsets expectations based on prior law is not retroactive.'" *Id.* (internal citations omitted). The agency action merely "impaired the future value of past bargains but has not rendered past actions illegal or otherwise sanctionable." *Id.* The court quoted from *Chemical Waste Management v. EPA*, 869 F.2d 1526, 1536 (D.C. Cir. 1989), where the court had observed that "[i]t is often the case that a business will undertake a certain course of conduct based on the current law, and will then find its expectations frustrated when the law changes." 567 F.3d at 670. In *Chemical Waste*, the court had further observed that "[t]his has never been thought to constitute retroactive lawmaking, and indeed most economic regulation would be unworkable if all laws disrupting prior expectations were deemed suspect." 869 F.2d at 1536. By parity of reasoning, the court in *National Cable* held that "[s]uch expectations, however legitimate, cannot furnish a sufficient basis for identifying impermissibly retroactive rules." 567 F.3d at 670.

Additionally, intervenors maintain, the Final Rule does not make past conduct illegal or newly sanctionable for at least two reasons. First, in the transition from RFS1 to RFS2, EPA allowed obligated parties "credit for renewable fuel purchased in 2009, and protect[ed] any vested rights in credits (or RINs) already purchased." Intvrs.' Br. 30; *see* 75 Fed. Reg. at 14,719,

724.[30] There is no change. As in 2009, EPA determined obligated parties will continue to receive 1.5 equivalent credits for each gallon of biodiesel, including biomass-based diesel. *See supra* note 18. Petitioners' claim, then, that under the RFS2 regulations the biodiesel RINs are valued at only 1 gallon of renewable fuel whereas the 2009 biodiesel RINs were worth 1.5 gallons for each gallon of biodiesel, ignores the equivalence provided by the biomass-based diesel standard. *See supra* note 18. Further, EPA applied this same 1.5 credit to the advanced biofuels requirement, "determining that the 2010 biomass-based diesel requirement 'will automatically fulfill the advanced biofuel standard, given the energy-based Equivalence Values for biodiesel and renewable diesel.'" Intvrs.' Br. 30–31 (quoting Renewable Fuel Standard Program (RFS2) Summary and Analysis of Comments at 3.6.2); *see supra* note 18. Second,

---

[30] Petitioner NPRA had commented:

> To be fair to companies that relied on EPA's strongly-worded advice and to maintain the regulated industry's confidence in EPA's written word, [EPA] needs to preserve the ability to use prior-year diesel RINs for biomass-based diesel compliance regardless of how and when the program finally rolls out. To do otherwise is to strand capital or operating expense. Companies that followed [EPA's] advice should not be punished for acting in good faith. Also at risk is EPA's often-used contention that regulated parties know what is coming and so have time to prepare for compliance in excess of what is provided between final Agency action and effective date. If EPA's *written* advice in this case cannot be relied upon, regulated parties cannot possibly be expected to do any compliance planning until final action is complete.

Comments of the National Petrochemical & Refiners Association on EPA's Proposed Changes to the Renewable Fuel Standard Rules at 12 (Sept. 25, 2009) (emphasis in original).

although the Final Rule changed EPA's proposed determination as to which renewable fuels will qualify for each mandate, "those determinations apply solely to renewable fuel produced (and thus purchased) after July 1, 2010," Intvrs.' Br. 31 (citing 75 Fed. Reg. at 14,877), and "all RINs generated in 2010 will be valid for meeting the 2010 standards," 75 Fed. Reg. at 14,684. Petitioners' contrary suggestion, that the Final Rule "attaches new consequences to 2009 transactions" by changing the fuels that qualify to generate RINs, is incorrect. Petrs.' Br. 35. Intervenors conclude obligated parties that did not purchase biodiesel in 2009 (or for the first half of 2010) unreasonably relied on the assumption that EPA would not require the biomass-based diesel levels to be met.

Intervenors acknowledge, however, that to the extent petitioners contend the RFS2 regulations affect their expectations and the future value of past bargains, their objection is to secondary retroactivity, *see Nat'l Cable*, 567 F.3d at 670–71; *see also Bowen*, 488 U.S. at 220 (Scalia, J., concurring). Intervenors respond that this objection is overcome by the reasonableness of EPA's approach in the Final Rule.

Petitioners resist categorizing their retroactivity challenge as confined to secondary retroactivity on two grounds. First, petitioners reply that "[r]etroactive rules are not limited to those that render past actions 'illegal'" but include "laws that impose new obligations on completed transactions." Reply Br. 17. They point, however, only to their hypothetical diesel importer without claiming that either they or their members include such a company or disputing intervenors' analysis of the state of the law prior to July 1, 2010. *See supra* note 28. Second, petitioners point out that the EISA is not self-executing and required revisions to the RFS1 regulations promulgated under the 2005 Act. This is evident to some extent from the plain text of the EISA and, indeed, EPA acknowledged that "[w]ith very few

exceptions, the new EISA requirements are not effective until such time as EPA issues final regulations to implement them," 2008 Notice, 73 Fed. Reg. at 70,643.

It is unnecessary for the court to resolve whether petitioners have thus shown that the legal obligations for pre-July 1, 2010 production or importation changed to their detriment under the Final Rule. If petitioners are correct that as of July 1, 2010 they were subject to new duties or disabilities regarding past transactions, any primary retroactive effects were implicitly authorized under the EISA and EPA reasonably balanced any retroactive effects against the benefits of applying the RFS2 regulations to the full calendar year.

**B.**

In *Sierra Club v. Whitman*, 285 F.3d 63, 68 (D.C. Cir. 2002), this court observed that although "[t]he relevant provisions of the Clean Air Act contain no language suggesting that Congress intended to give EPA the unusual ability to implement rules retroactively," "[t]here may be an exception for situations in which the 'statute prescribes a deadline by which particular rules must be in effect' and the 'agency misses that deadline.'" The internal quotation was to Mr. Justice Scalia's concurring opinion in *Bowen*, 488 U.S. at 224–25, which observed additionally that the retroactivity must be "reasonable." *Id.* at 224. This court has "treat[ed] Justice Scalia's concurring opinion as substantially authoritative, though noting that '[t]he *Bowen* majority . . . neither embraced nor rejected Justice Scalia's view.'" *Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 588 (D.C. Cir. 2001) (citing and quoting *Bergerco Canada v. U.S. Treasury Dep't*, 129 F.3d 189, 192–93 (D.C. Cir. 1997)). The court in *Sierra Club* concluded that retroactive application would not be reasonable because "[r]etroactive relief would likely impose large costs on the States . . . even though they were

not on notice at the time." 285 F.3d at 68. A contrary conclusion is warranted in the instant case.

EPA had clear albeit implicit authority under the EISA to apply both the 2009 and 2010 volume requirements in the 2010 calendar year in order to achieve the statutory purpose. The structure of the EISA demonstrates that Congress anticipated the possibility of some retroactive impacts in the first year of the expanded renewable fuel program. *Cf. Bowen*, 488 U.S. at 209–11. Congress set volume requirements for the entire calendar year even though that year's renewable fuel standard was not required to be in place until November 30 of the prior year and the revised regulations were not required to be in place until December 19, 2008. Thus, even if the 2009 renewable fuel standard was in place by November 30, 2008 and the revised regulations had been promulgated by December 19, 2008, the final rule would not have been effective until completion of the 60-day Congressional Review period for a major rule, *see supra* note 16, at the earliest February 18, 2009, one and one-half months into the calendar year. Yet the revised regulations would have applied to all of an obligated party's production or importation of gasoline or diesel fuel in the 2009 calendar year.

As Congress structured the EISA, then, Congress knew that in the first year of the expanded renewable fuel standard there could be one and one-half months of retroactive effect from the effective date of the revised regulations. In initially establishing the renewable fuel program Congress was explicitly aware EPA might miss a statutory deadline for promulgating regulations. The 2005 Act set an August 8, 2006 deadline but directed that those regulations would apply to the entire year, regardless of when the regulations were issued[31]; further, that if EPA did not promulgate regulations by that date, then the default renewable

---

[31] *See supra* note 4.

fuel standard would apply for all of 2006.[32]   The absence of a comparable default provision in the EISA appears explained by the fact that Congress was expanding an existing renewable fuel program and EPA could, as it did, leave in place the RFS1 regulatory program, adjusting it to incorporate the 2009 volume requirement, until the revised regulations under the EISA (i.e., RFS2) were finalized.  *See* 2008 Notice, 73 Fed. Reg. at 70,643. EPA points to section 7545(o)(2)(A)(iii), *supra* note 23, and that provision indicates as well Congress' focus on ensuring the annual volume requirement was met regardless of EPA delay. The Final Rule adopts the same approach: putting the 2009/2010 volume requirements in place at the earliest date notwithstanding agency delay.

Furthermore, unlike in *Whitman*, 285 F.3d at 68, the effect of the Final Rule's retroactivity does not make "the situation worse," *id.*, for the obligated parties had ample notice that they would need to accumulate RINs to meet the 2010 standards. Long before the Final Rule was published in the Federal Register on March 26, 2010, the 2008 Notice alerted obligated parties to EPA's likely approach of increasing the 2010 obligation and allowing 2009 RINs to be counted in meeting that obligation, and advised that it "would behoove [obligated parties] to acquire the necessary RINs . . . in 2009 in preparation for their 2010 compliance demonstration." 73 Fed. Reg. at 70,643.  Similar advice was included in the NPRM when the 2009/2010 approach was formally proposed.  74 Fed. Reg. at 24,908.  Obligated parties had actual notice of the 2010 standards when they were posted on EPA's website on February 3, 2010.  *See* NPRA Responds to New Renewable Fuel Standard Guidance for 2010 and Beyond (Feb. 3, 2010); API Statement on RFS2 Announcement (Feb. 3, 2010).  EPA found that renewable fuel producers and importers continued to generate RINs between

---

[32]  *See supra* note 6.

January 1 and July 1, 2010 for fuels qualifying as renewable fuels under the RFS1 program. 75 Fed. Reg. at 14,676. Under the Final Rule, these RINs are available for purchase and can be used to demonstrate compliance with the 2010 standard, *id.*, and so obligated parties are able to purchase RINs towards compliance with their 2010 obligations during the entire calendar year. And with one limited exception, obligated parties can carry over a deficit from 2010 into 2011, and they have until February 28, 2011 to demonstrate their compliance with the 2010 standards. *See* 75 Fed. Reg. at 14,719; *supra* note 19.

## C.

Petitioners respond that the court cannot uphold the Final Rule based on EPA's *post hoc* rationalization that it is permissibly retroactive, as opposed to not being retroactive at all. Although petitioners do not seek a remand of the Final Rule, their position presents the question whether a remand is required. *See State Farm*, 463 U.S. at 43. During oral argument counsel for EPA suggested a remand is not required because the question whether the Final Rule was impermissibly retroactive is a legal question for the court to decide and does not involve a policy or judgment entrusted to EPA by Congress. Oral Argument at 40:50. But in *State Farm*, the Supreme Court, citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), adopted the same approach in a rulemaking as in an adjudication to the extent it rejected the view that the court could supply reasons for the agency's action that the agency has not given. 436 U.S. at 43. In the initial *Chenery* decision, the Supreme Court instructed that when Congress has delegated "a determination of policy or judgment which the agency alone is authorized to make and *which it has not made*, a judicial judgment cannot be made to do service for an administrative judgment." *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943) (emphasis added). It follows that although it is for the court to decide the legal question presented by petitioners' retroactivity challenge to the Final Rule, the

agency had to grapple with the question, given its delay, in reaching its determination about how it would apply the revised regulations promulgated pursuant to the EISA. "[T]he courts may not accept appellate counsel's *post hoc* rationalizations for agency action." *State Farm*, 463 U.S. at 50.

We reject petitioners' position, however, because it is based upon the false premise that EPA did not "consider whether the strong considerations that weigh against adopting retroactive rules would justify a different course than it chose." Reply Br. 18. The rulemaking record demonstrates that, in rejecting obligated parties' concerns about possible retroactive effects, EPA has fulfilled its obligation "to consider the relative benefits and burdens," *National Cable*, 567 F.3d at 671, in concluding that applying the RFS2 standard to the entire 2010 calendar year was the course "clearly . . . most consistent with [the] EISA's requirement of four different volume mandates for all of calendar year 2010," 75 Fed. Reg. at 14,676.

First, EPA concluded that there was adequate lead time. "To facilitate the volume obligations being based on the full year's gasoline and diesel production, and to enable the smooth transition," the revised regulations provided that RINs "that were generated under the RFS1 regulations will continue to be valid for compliance with the RFS2 obligations." 75 Fed. Reg. at 14,675. Obligated parties also would have "two months after the end of the calendar year," until February 28, 2011, to demonstrate compliance with their volume obligations. *Id.* at 14,676. EPA noted that there was an adequate supply of RINs available, and that having the transition from the RFS1 regulatory program occur on July 1, 2010, the start of the first quarter following completion of the statutorily required 60–day Congressional Review period, would simplify recordkeeping and reporting transitions to the RFS2 regulations. *Id.* at 14,675. EPA observed that obligated parties comply by obtaining the

appropriate number of RINs from producers of renewable fuel, which is a matter of contract or other arrangements with renewable fuel producers or other holders of RINs. *See id.* at 14,676. They do not need lead time for construction or investment purposes; they are not changing the way they produce gasoline or diesel; they do not need to design or install new equipment, or take other actions that require longer lead time. *Id.* Although EPA had endorsed a delayed effective date for the initial renewable fuel program, when the regulatory system was new and time was needed to put in place the RIN tracking system and train staff, *see* RFS1, 72 Fed. Reg. at 23,913, EPA noted that now "[o]bligated parties . . . have experience implementing RFS1 and the actions needed to comply [with RFS2] are a continuation of these kinds of RFS1 activities." 75 Fed. Reg. at 14,676.

Second, EPA concluded that obligated parties "have received adequate notice of this obligation," *id.*, referencing the NPRM, EPA's "discussions with many stakeholders during the rulemaking," and publication of the Final Rule in the Federal Register. *Id.* In reaching its conclusion, EPA also took into consideration what was required for the re-registration process of RINs for 2010 and IT systems changes that would be necessary. *See id.*

Third, EPA considered other approaches and found them problematic. In the NPRM, EPA sought comments on different effective dates and reduction of the total renewable fuel standard for 2010. *See* 74 Fed. Reg. at 24,956. Upon consideration of the alternatives suggested by refiners and producers — from delaying the effective date to 2011 to using an interim rule for 2009 — EPA concluded these approaches would create "significant legal and policy issues" without meeting the volume mandates at the earliest time. 75 Fed. Reg. at 14,718–19. For example, the suggestion for an interim rule that put in place a

new volume requirement without also putting in place the EISA's new definition of biomass-based diesel renewable fuel and renewable biomass would have required a new proposal with public notice and time for public comment, making it unlikely any interim rule could have affected biodiesel demand in 2009. *See id.* Further, EPA explained, resources applied to the interim rule would have been unavailable for development of the final RFS2 rulemaking and undermined EPA's ability to complete the RFS2 program in time for its implementation in 2010. *See id.* at 14,719.

Because EPA balanced the benefits and the burdens attendant to its approach, and considered the suggested alternatives, a remand would serve no purpose. *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 765 n.6 (1969); *Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 251 F.3d 1007, 1014 (D.C. Cir. 2001); *see also Mass. Trustees of E. Gas & Fuel*, 377 U.S. 235, 247 (1964). EPA has already adequately examined the claimed retroactive effects of the Final Rule in determining how best to carry out Congress' mandate that it "ensure" the applicable volume requirement for 2009 is met.

## IV.

In what petitioners term the "leadtime" issue, they contend that in order to give obligated parties the time specified by Congress to comply with the RFS2 regulations, "if the rules take effect on July 1, 2010, they must be issued by June 17, and cannot apply to transactions completed before July 1." Reply Br. 28. Petitioners note that EPA delayed publication of RFS2 regulations and the 2010 standard in the Federal Register until March 26, 2010, but imposed obligations on transactions beginning January 1, 2010. There is no meaningful difference between this contention, however, and petitioners' contention that the Final Rule is impermissibly retroactive.

Lastly, petitioners contended in their opening brief that the credit and deficit carryover provisions require EPA to give petitioners "the full statutory compliance period of one year to fulfill each year's volume obligations." Petrs.' Br. 39. On reply petitioners retreat to the position that "EPA ignore[d] the option . . . of providing a shorter period of time to comply with a proportionally reduced obligation, such as six months to comply with 50 percent of the annual obligation." Reply Br. 28. The cited provisions merely limit the duration of the credits obligated parties may generate and establish conditions for carrying forward deficits. The rulemaking shows EPA considered other options and rejected them. In any event, the obligated parties represented by petitioners were given more than a year to comply with the Final Rule — from at least February 3, 2010, when notice of the 2010 standards in the Final Rule was posted on EPA's website and petitioners issued press releases indicating familiarity with the Final Rule, until February 28, 2011, when they will need to show that they have complied with the RFS2 regulations for 2010 — and no provision in the EISA requires EPA to create a "proportionally reduced obligation."

Accordingly, we deny the petitions for review.